**WESTERN PAC. R. CORPORATION v. BOWERS, Collector of Internal Revenue.**

District Court, S. D. New York. December 31, 1927.

**Internal revenue ⬅➙9(23)—Holding company financing subsidiary reorganized railroad corporation, and enforcing judgment of bondholders through transactions involving reorganization of entire railroad system held taxable as "carrying on business"; "doing business" (Revenue Act 1918, § 1000 [Comp. St. § 5980n]).**

Corporation formed on reorganization of railroad company, which took over stock of new operating company and the partially paidup bonds of the old railroad corporation as holding company, made advancements to operating corporation, and through negotiation of substantial credits and purchase of extensive properties and incorporation of new companies undertook enforcement of judgment against associated railway company, and which by such transactions accomplished reorganization of the entire railroad system, *held,* liable for capital stock tax under Revenue Act 1918, c. 18, § 1000, 40 Stat. 1126 (Comp. St. § 5980n), as "carrying on or doing business" during taxable period and preceding year.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Carry on Business; Doing Business.]

At Law. Action by the Western Pacific Railroad Corporation against Frank K. Bowers, Collector of United States Internal Revenue for the Second District of New York. Plaintiff's complaint dismissed.

Action to recover taxes alleged to have been unlawfully assessed and collected by defendant and paid under protest by plaintiff. Trial was had in December, 1926, pursuant to written stipulation waiving a jury. Final submission was delayed by counsel for various reasons until October 7, 1927.

Purporting to act pursuant to section 1000 of the Revenue Act of 1918, chapter 18, 40 Stat. 1057, 1126 (Comp. St. § 5980n), the collector of internal revenue assessed against the plaintiff capital stock taxes in the sums of $24,526, for the period ending June 30, 1920, $30,374.30 for the period ending June 20, 1921, and $31,202 for the period ending June 30, 1922. Having paid these taxes under protest, plaintiff seeks recovery thereof upon the ground that it was not engaged in business during the years preceding any one of the taxable periods in question, and was not engaged in business during any of the taxable periods except the last.

The Organization and Activities of the Plaintiff Prior to June 30, 1918.

On March 1, 1915, the Western Pacific Railway Company defaulted in the payment of interest on its first mortgage bonds, of which $50,000,000 in face amount were outstanding and were secured by mortgage upon its lines of railway from San Francisco to Salt Lake City. The Equitable Trust Company of New York was the trustee under this mortgage. These bonds were not only secured by the mortgage, but were in effect guaranteed as to the payment of principal and interest by the Denver & Rio Grande Railroad Company. Equitable Trust Co. v. Denver & R. G. R. Co. (C. C. A.) 250 F. 327. The trustee filed its bill to foreclose in the United States District Court for the Northern District of California, and thereafter, on June 28, 1916, all the property and assets of the old Western Pacific Railway Company were sold under foreclosure decree for the sum of $18,000,000, and were purchased by representatives of a reorganization committee with which $47,451,500 in face amount of the first mortgage bonds had been deposited subject to the provisions of a plan and agreement of reorganization. This plan contemplated the formation of an operating company having the right of eminent domain and the formation of a corporation which should own the stock of the operating company and the claims of the bondholders participating in the reorganization against the Denver Company. It was thought necessary by the committee that the operating company should be organized under California law, so that no doubt could arise regarding its right of eminent domain. The corporation which was to hold its stock and the bondholders' claims against the Denver Company was considered necessary by the committee because under the California statutes stockholders are subject to personal liability for corporate debts, and the only effective way to enforce the claims of the bondholders against the Denver Company was through the instrumentality of a single corporation which should have full power to act with respect to all the claims. These claims in the aggregate were so large that, assuming their validity, which was contested, their collection would necessarily present difficult problems, seriously complicated by the fact that the property of the Denver Company was itself threatened by foreclosure

of liens prior to the claims arising upon the agreement of guaranty, and requiring the exercise of business judgment and the negotiation and execution of financial plans and agreements in their solution.

Pursuant to this plan, the plaintiff corporation was organized under the laws of Delaware on June 29, 1916. The nature of its business and the objects and purposes proposed to be transacted, promoted, and carried on by it are defined in its certificate of incorporation as follows:

"To purchase, subscribe for, or otherwise acquire and own, hold, use, sell, assign, transfer, mortgage, pledge, exchange, or otherwise dispose of real and personal property of every kind and description, including shares of stock, bonds, debentures, notes, evidences of indebtedness and other securities, contracts, or obligations of any corporation or corporations, association or associations, domestic or foreign, and to pay therefor, in whole or in part, in cash or by exchanging therefor' stocks, bonds, or other evidences of indebtedness or securities of this or any other corporation, and while the owner or holder of any such real or personal property, stocks, bonds, debentures, notes, evidences of indebtedness, or other securities, contracts, or obligations, to receive, collect, and dispose of the interest, dividends, and income arising from such property and to possess and exercise in respect thereof all the rights, powers, and privileges of ownership, including all voting powers on any stocks so owned."

"To aid, either by loans or by guaranty of securities or in any other manner, any corporation, domestic or foreign, any shares of stock or any bonds, debentures, evidences of indebtedness, or other securities whereof are held by this corporation or in which it shall have any interest and to do any acts designed to protect, preserve, improve, or enhance the value of any property at any time held or controlled by this corporation or in which it at that time may be interested."

"To enter into, make, perform, and carry out contracts of any kind for any lawful purpose with any persons, firms, associations, or corporations."

"To purchase, acquire, lease, own, and enjoy any and all such other property, real and personal, as may be reasonably necessary for the carrying on of the business of the corporation."

As originally drawn, the certificate of incorporation authorized the directors to enforce, and, with the approval of two-thirds of the stockholders, to compromise or settle claims which it might acquire arising out of the agreement of the Denver & Rio Grande Railroad Company, by which it guaranteed payment of the old Western Pacific bonds, but required that the proceeds of these claims should either be distributed to its stockholders, or, if not distributed, paid over to the operating company upon such lawful consideration, or without consideration, as agreed. This provision was amended on November 29, 1920, so as to permit, as an additional alternative, the retention of the proceeds of such claims as corporate assets, but only upon issuing to the stockholders in proportion to their holdings paid-up stock to the amount of the fair value of the assets so retained.

The authorized capital of the plaintiff company was $75,000,000, consisting of $47,500,000 par value of common stock and $27,500,000 par value of 6 per cent. preferred stock. The operating company was organized with the same capital. The properties purchased on foreclosure were transferred to the operating company in exchange for its entire capital stock of $75,000,000, and this stock was transferred and assigned to the plaintiff corporation in exchange for $74,996,400 par value of its capital stock, which was distributed among the former owners of the first mortgage bonds of the old Western Pacific, who had deposited their bonds with the reorganization committee, and to underwriters of a new issue of $20,000,000 face amount of first mortgage bonds of the operating company. The reorganization committee also transferred and assigned to the plaintiff corporation the $47,451,500 face amount of the partially paid first mortgage bonds of the old Western Pacific, together with all the rights inhering in said bonds to recover from the Denver Company the balance remaining unpaid thereon after crediting the amount realized upon the foreclosure sale.

In 1916 the trustee instituted an action in this court against the Denver Company to recover damages suffered by the bondholders of the old Western Pacific by reason of the Denver Company's breach of its contract of guaranty. The trustee recovered judgment in that suit for the sum of $38,270,343.17, which judgment was affirmed by the United States Circuit Court of Appeals for the Second Circuit on January 3, 1918 (250 F. 327). On April 15, 1918, the Supreme Court of the United States (246 U. S. 672, 38 S. Ct. 423, 62 L. Ed. 932) denied the Denver Company's petition for a writ of certiorari to review this judgment. In October, 1917, the trustee received $3,003,562.52 in partial satisfaction of this judgment by means of an ex-

ecution sale of certain Liberty bonds owned by the Denver Company. Prior to July 1, 1918, judgments on said judgment were obtained by the trustee against the Denver Company in various other courts, including the Supreme Court of New York, the Supreme Court of the state of Illinois, and the United States District Court for the District of Colorado. In January, 1918, the Denver Company was thrown into receivership by suit brought by one of its creditors in the United States District Court for the District of Colorado. The trustee intervened in said suit and proved its judgments as a claim against the Denver Company.

### The Activities of the Plaintiff from July 1, 1918, to June 30, 1919.

During this period, which is the year preceding the first taxable period involved, the company maintained no office except its statutory office in Delaware. Meetings of its directors and executive committee were held in the office of the Equitable Trust Company, in New York City. Stock books were kept for the transfer of the plaintiff's capital stock; corporate accounting books and records were kept; taxes were paid; and such action was taken as was required to maintain the corporate existence and organization of the plaintiff corporation. Only one of the plaintiff's officers, its secretary and treasurer, received a regular salary. The plaintiff owned and voted by proxy all of the capital stock of the operating company and all of the capital stock of Western Railway Securities Company, a corporation which was organized in 1917 under the laws of the state of Illinois in order to facilitate the giving of attachment bonds by the trustee in suits instituted by it against the Denver Company in the courts of Illinois. In 1917 the plaintiff had borrowed $275,000 from the Equitable Trust Company of New York, with which it had subscribed and paid for $275,000 par value of the capital stock of this Securities Company. In October, 1918, the Securities Company was dissolved, and its assets, including $250,000 of Liberty bonds, were transferred to the plaintiff as its sole stockholder. The loan from the Equitable Trust Company was repaid, with interest, in November, 1918, and January, 1919. On September 3, 1918, the plaintiff sold $215,500 face amount of United States Liberty Loan bonds, and on October 24, 1918, purchased $1,000,000 face amount of United States Liberty Loan bonds, $250,000 face amount of which were sold on November 4, 1918. On September 4, 1918, the plaintiff purchased $61,000 face amount of the first consolidated mortgage bonds of the Rio Grande Western Railway Company.

During this period plaintiff received one dividend of 1 per cent. on the preferred stock of the operating company, amounting to $275,000. It also received interest from bank balances and securities owned by it; interest received from all sources during the period amounting to $58,078.44. It also received from the trustee distributions amounting to $5,056,750 out of the moneys collected from the Denver Company with respect to the first mortgage bonds of the old Western Pacific. It paid three dividends of 1½ per cent., and one dividend of 1 per cent., on its preferred stock. No dividends were paid on plaintiff's common stock.

The Denver Company was for many years prior to and up until June 20, 1918, the owner of all of the capital stock ($10,000,000 par value) of Utah Fuel Company, a corporation of the state of New Jersey, which owned and operated coal mines in the state of Utah, subject to the pledge thereof under the first consolidated mortgage of the Rio Grande Western Railway Company. The equity and interest of the Denver Company in this stock was sold on June 20, 1918, on execution in partial satisfaction of the judgment theretofore secured by the trustee against the Denver Company in the Supreme Court of New York. This fuel company stock had no market value. To protect its interest, an agreement was made by the plaintiff with a firm of bankers, by which it was agreed that the bankers should bid for the stock, and, if successful in acquiring it, hold it for the account of the plaintiff; the plaintiff agreeing to furnish the necessary funds and to indemnify the bankers against loss. The bankers acquired the stock for the sum of $4,000,000, and borrowed that amount, pledging the stock as security for the loan. Thereafter, on October 28, 1918, the plaintiff paid off the loan with interest, and on February 14, 1919, the bankers transferred and assigned to the plaintiff all their interest in the stock. The plaintiff then demanded of the trustee of the mortgage under which the stock was held as security, and in whose name the stock stood of record, proxies to vote the stock and dividend orders entitling plaintiff to receive such dividends as might be declared thereon. Claims were thereupon made by other parties denying plaintiff's interest in this stock, and the trustee refused to recognize the plaintiff's rights as owner, whereupon plaintiff instituted action in this court to establish and enforce its rights with respect to the stock of the Utah

Fuel Company. Counsel were retained, and such other acts were done as were necessary and proper in the conduct of this action.

During the period in question, the railroad property of the operating company was in the possession of the Director General of Railroads. Due to delays of the Director General in making advances applied for by the operating company, the operating company was forced to borrow during the months of June, 1918, to January, 1919, inclusive, $37,005.06 to provide for its incidental corporate expenses, and also $435,000, with which to pay the installment of interest on its first mortgage bonds maturing September 1, 1918. The plaintiff advanced these amounts to the operating company, which repaid them with interest in December, 1918, and January, 1919, from moneys received from the Director General of Railroads. Interest was charged and paid on these advances. During the entire period plaintiff employed counsel to assist counsel for the trustee in the conduct of the receivership proceedings pending against the Denver Company and in the conduct of proceedings for the enforcement of the judgment against the Denver Company, and from time to time directed and advised the trustee and counsel with respect thereto.

### The Activities of the Plaintiff from July 1, 1919, to June 30, 1920.

During this period there was no change in regard to the company's office, meetings of its directors and executive committee, payment of salaries, and other acts required to maintain the corporate existence and organization of the plaintiff. It continued to own and vote the capital stock of the operating company, $1,000,000 face amount of United States Liberty Loan bonds, and $61,000 face amount of first consolidated mortgage bonds of the Rio Grande Western Railway Company which it had purchased on September 4, 1918. It also continued to own and hold the partially paid first mortgage bonds of the old Western Pacific, and it received three dividends of 1 per cent. and two dividends of 1½ per cent. each on the preferred stock of the operating company, amounting to $1,650,000. It also received interest on bank balances and securities owned by it, amounting to $125,104.22. From the trustee it received a distribution amounting to $1,500,000 out of the moneys collected from the Denver Company with respect to the first mortgage bonds of the old Western Pacific. It paid four dividends of 1 per cent. each on its preferred stock. No dividends were paid on its common stock.

The receivership of the Denver Company, and the litigation of the trustee against the Denver Company, continued during this period, and plaintiff employed counsel to assist counsel for the trustee in the prosecution and enforcement of its rights against the Denver Company and from time to time directed and advised said trustee and counsel with respect thereto.

On May 26, 1920, there were sold on execution under the New York judgment $300,000 par value (being the entire issue of the capital stock) of the Western Realty Company; $3,000,000 par value of the capital stock of the Globe Express Company; $112,500 par value of the capital stock of the Western Pacific Railroad Corporation; $523,000 face amount of the bonds of the Colorado-Midland Railway Company; $30,000 face amount of bonds of the Western Pacific Railroad Company. None of these securities except the stock of the Western Pacific Railroad Corporation and the bonds of the Western Pacific Railroad Company had any market value, and, in order to protect its interests as the beneficial owner of approximately 95 per cent. of the judgment against the Denver Company, the plaintiff borrowed from the Equitable Trust Company of New York $1,500,000 on May 26, 1920, and on said date the plaintiff bid in said securities at said sale for the sum of $1,282,235.12. The net proceeds of sale were paid over to the trustee by the sheriff of New York county, and on May 28, 1920, the trustee paid the plaintiff $1,500,000 as a distribution on the first mortgage bonds of the old Western Pacific owned by the plaintiff, and immediately thereupon the plaintiff repaid the Equitable Trust Company of New York the loan above mentioned.

The action brought by the plaintiff in this court to enforce its rights with respect to the capital stock of the Utah Fuel Company continued and remained pending during this period, and plaintiff employed counsel and did such other acts as were necessary and proper in the conduct of this action.

### The Activities of the Plaintiff from July 1, 1920, to June 30, 1921.

During this period the plaintiff's stockholders held the usual annual meeting for the election of directors and a special meeting for the purpose of amending the certificate of incorporation by increasing the capital stock to $60,000,000 par value of common and $40,000,000 par value of preferred; also authorizing the amendment to which reference has already been made, pursuant to which the pro-

ceeds realized on the corporation's claim against the Denver Company might be retained for corporate purposes upon issuing to the stockholders fully paid stock representing the value of such proceeds so retained. Another special meeting was held for the purpose of authorizing the exchange of 4 per cent. notes of the plaintiff for adjustment mortgage bonds of the Denver Company. There was no change in the company's office, the meetings of its directors and executive committee, the keeping of its books, or the doing of such acts as were required to maintain the corporate existence and organization of the plaintiff. The plaintiff continued to own and to vote by proxy all of the capital stock of the operating company, $1,000,000 face amount of United States Liberty bonds which it had purchased on October 24, 1918, and also $61,-000 face amount of the first consolidated mortgage bonds of the Rio Grande Western Railway Company which it had purchased on September 4, 1918. It also continued to own the partially paid first mortgage bonds of the Western Pacific, and also the securities which it had purchased at execution sale on May 26, 1920, except that during this period the Globe Express Company was dissolved, and in liquidation of its assets the plaintiff received in exchange for the stock of said corporation owned by it the following securities: First consolidated mortgage bonds of the Denver & Rio Grande Railroad Company, $10,000 face amount; improved mortgage bonds of the Denver & Rio Grande Railroad company, $16,500 face amount; first consolidated mortgage bonds of Rio Grande Western Railroad Company, $124,000 face amount; first mortgage bonds of Utah Fuel Company, $50,000 face amount.

During this period the plaintiff purchased $25,000 par value of the capital stock of the Rio Grande Junction Railway Company, a corporation owning an important link between portions of the main line of railway of the Denver Company, and which was operated by the Denver Company under lease. The Rio Grande Junction Railway Company had issued and outstanding $2,000,000 par value of capital stock, $1,959,000 par value of which was owned by the Denver Company. The plaintiff anticipated that, when the receivership proceedings against the Denver Company in the United States District Court for the District of Colorado should be terminated by a sale of the assets of the Denver Company, the plaintiff would probably become, either itself or acting through a subsidiary, the purchaser of those assets at said sale, and the purchase of said $25,000 par value of the stock of the Rio Grande Junction

Railway Company was made by plaintiff with a view to the elimination of minority stock holdings in said company and the consolidation thereof with the eventual owner of the lines of railway of the Denver Company.

During this period the plaintiff received four dividends of 1½ per cent. each on the preferred stock of the operating company, amounting to $1,650,000. Plaintiff also received interest from bank balances and securities owned by it; interest received by plaintiff from all sources during said period amounting to $210,192.60. Plaintiff received from the trustee a distribution amounting to $4,001,208.75 out of the moneys collected from the Denver Company with respect to the first mortgage bonds of the old Western Pacific. Plaintiff paid during this period four dividends of 1½ per cent. each on its preferred stock. No dividends were paid on plaintiff's common stock. The receivership of the Denver Company continued during this period, and plaintiff employed counsel to assist counsel for the trustee in the prosecution and enforcement of the rights of the first mortgage bondholders of the old Western Pacific during the course of this receivership, and from time to time directed and advised the trustee and counsel with respect thereto.

On September 25, 1920, a decree was entered in said receivership directing the sale of all the properties and assets of the Denver Company, subject to the existing bonded indebtedness of the Denver Company of approximately $120,000,000, in order to satisfy the claim upon the judgment against the Denver Company. In order to protect the rights of the first mortgage bondholders of the old Western Pacific, and to prevent the sacrifice of any portion of the value of said properties, plaintiff caused to be organized under the laws of the state of Delaware the Denver & Rio Grande Western Railroad Company, for the purpose of acquiring and operating these properties, which is hereinafter referred to as the "new Denver Company." The plaintiff also caused to be organized another corporation under the laws of the state of Colorado, under the name Denver & Rio Grande Western Railroad Company, which would be available to acquire and operate said properties in case the new Denver Company should not secure the necessary authority from the state of Colorado to acquire and operate the same. The plaintiff advanced the funds required in connection with procuring the organization of these two corporations and the authorization of the new Denver Company to transact business in the states of Colorado, New Mexico, and Utah.

Plaintiff also entered into a contract, on

November 11, 1920, with certain individuals called "the purchasers," by which they agreed to attend the sale of the properties of the Denver Company and to bid for the same, and to transfer the same if their bid should be accepted to the new company, in consideration of which the new Denver Company agreed to issue to said purchasers 300,000 shares of its nonpar value stock, which stock the purchasers agreed to transfer to the plaintiff, which agreed to protect the purchasers and hold them harmless from any loss or liability in connection with the transaction. The sale was held on November 20, 1920, and the purchasers submitted a bid of $5,000,000, which, being the only bid received, was accepted, and the sale of said properties to the purchasers was confirmed by order of the court entered on March 28, 1921. Such portion of the purchase price as was required by order of the court to be paid in cash was advanced to the purchasers by the plaintiff, and the balance of the purchase price was paid by means of a credit on the first mortgage bonds of the old Western Pacific owned by the plaintiff. The new Denver Company, the plaintiff, and the purchasers duly made application to the Interstate Commerce Commission to secure authorization for the issue of stock of the new Denver Company and for the acquisition thereof by the plaintiff, which authority was duly granted. The properties were not transferred, and the stock of the new company was not issued to the plaintiff, until after June 30, 1921.

The action which the plaintiff had brought in this court to enforce its rights with respect to the capital stock of the Utah Fuel Company continued during this period, and plaintiff employed counsel and did such other acts as were necessary or proper in the conduct thereof.

On March 1, 1920, the railroad properties of the operating company were returned to it by the United States government, at which time the government retained all cash and cash assets arising from the operation of these properties pending the consummation of the final settlement between the government and the operating company. This settlement was consummated in May, 1921, and, pending its consummation, the operating company required considerable sums of money for operating expenses, interest, dividends, and to meet payments on account of equipment theretofore purchased by it. It was necessary for the plaintiff to advance sums to the operating company in order to protect the plaintiff's interests as sole stockholder thereof, and accordingly, in March, April, and May, 1921,

the plaintiff did make advances to the operating company aggregating $2,787,500, of which the operating company used $495,597.50 to meet the March 1, 1921, installment of interest on its first mortgage bonds, $204,402.50 for working capital, $412,500 to provide for the payment of a dividend on its preferred stock, and the balance to meet a payment due to the Pressed Steel Car Company on account of the purchase price of 619 gondolier cars which the operating company had theretofore purchased. Upon the consummation of its settlement with the United States government, the operating company repaid said advances to the plaintiff, on May 11, 1921. On June 30, 1921, the plaintiff advanced to Rio Grande Southern Railroad Company, a subsidiary of the Denver Company, $54,640 to enable the Rio Grande Southern Railroad Company to pay bond interest falling due on July 1, 1921, in order to prevent a default on said bonds.

During this period the operating company was desirous of obtaining control of the Sacramento-Northern Railroad, a corporation in the state of California which owned and operated lines of railroad in that state, control of which lines would be beneficial in developing the business of the operating company. Under the provisions of the first mortgage of the operating company, the bonds could not be issued thereunder in exchange for the bonds of the Sacramento-Northern Railroad, because all of the stock of the Sacramento-Northern Railroad was not owned by the operating company, and it was impossible to acquire every share of said stock; wherefore the plaintiff decided to purchase the first mortgage bonds of the operating company, acquire said securities of the Sacramento-Northern Railroad, transfer the properties of Sacramento-Northern Railroad to a new corporation, which should assume the bonds of Sacramento-Northern Railroad, and to transfer said bonds and stock of said new corporation to the operating company at the cost thereof to plaintiff. With a view to the eventual acquisition thereof by the operating company, the plaintiff, on January 20, 1921, offered to purchase from the security holders of Sacramento-Northern Railroad the stock of said company for cash, and its bonds by exchanging therefor bonds of the operating company at a ratio stated in said offer. To enable it to carry out its offer to the security holders of the Sacramento-Northern Railroad, on May 26, 1921, the plaintiff purchased from the operating company $4,180,000 face amount of the first mortgage bonds of the operating

company at 85 and accrued interest. Pursuant to said offer, the plaintiff has acquired substantially all of the capital stock and bonds of Sacramento-Northern Railroad, which it still holds pending approval by the Interstate Commerce Commission of the acquisition thereof by the operating company, application for which approval is now pending.

During this period the plaintiff, in anticipation and in view of its acquisition through its subsidiary of the properties and assets of the Denver Company, entered into negotiations with various committees representing the owners of bonds issued and outstanding under the first and refunding mortgage and the adjustment mortgage of the Denver Company, which mortgages constituted liens upon said properties, and under which there had for some time been technical defaults. The negotiations with these committees had for their object the adoption and carrying into effect of some plan for the reorganization of the system of railways owned by the Denver Company with a view to readjusting the indebtedness and fixed charges. To this end the plaintiff made an offer to the adjustment bondholders of the Denver Company whereby plaintiff agreed to acquire said adjustment bonds by issuing in exchange therefor notes of the plaintiff to be secured by a trust agreement to bear 4 per cent. interest and to mature in ten years. In connection with this offer, the board of directors of the plaintiff, on June 29, 1921, duly approved a form of trust agreement to secure these notes. The agreement was not executed until after June 30, 1921.

The properties of the Denver Company were seriously damaged by flood during the spring of 1921, which necessitated extensive repairs and reconstruction in order to restore normal operating conditions. The properties were not. to be transferred to the new Denver Company until August 1, 1921, and the receiver was without funds available for the purchase of additional equipment required in the work. During the latter part of June, 1921, a contract was entered into by the plaintiff for the purchase of 25 dump cars for the sum of $105,000, and $200,000 was borrowed by the plaintiff from the Equitable Trust Company of New York on a 90-day note. This equipment was not delivered, and the purchase price thereof was not paid until after July 1, 1921. When the equipment was received, it was temporarily leased to the receiver, and after August 1, 1921, was temporarily leased to the new Denver Company, which subsequently paid the plaintiff the purchase price thereof and received a bill of sale therefor.

Taylor, Bowie & Marsh, of New York City (John F. Bowie and Rollin Browne, both of New York City, of counsel), for plaintiff.

Charles H. Tuttle, U. S. Atty., of New York City (Nathan R. Margold, Asst. U. S. Atty., of New York City, and Alexander W. Gregg and L. H. Baylies, both of Washington, D. C., of counsel), for defendant.

THACHER, District Judge (after stating the facts as above). The foregoing statement of the plaintiff's activities during the three annual periods preceding the taxable periods here in question is substantially alleged in the complaint, and is supported by uncontroverted testimony adduced on the trial. Liability for the tax attaches only if the corporation engages in business during the taxable period, and during the preceding year as well. Section 1000, Revenue Act 1918, article 26 Treasury Dept. Regulations 50, approved June 21, 1920. The question for decision is whether the activities of the plaintiff were such as to subject it to the special excise tax imposed by the statute "with respect to carrying on or doing business."

The question presented is clarified by attempting to state the plaintiff's contentions: First, it is contended that some of the plaintiff's activities were those merely incident to the passive holding of property upon which it received income which it invested or distributed to its stockholders. All of these activities, it is said, are to be laid aside under the decisions in McCoach v. Minehill & S. H. R. Co., 228 U. S. 295, 33 S. Ct. 419, 57 L. Ed. 842, and Zonne v. Minneapolis Syndicate, 220 U. S. 187, 31 S. Ct. 361, 55 L. Ed. 428. Second, the plaintiff's advances to the operating company are said to have been casual isolated transactions, not entered upon for profit or in the regular course of business, and are therefore not to be regarded as were the advances made by the plaintiff in Phillips v. International Salt Co., 274 U. S. 718, 47 S. Ct. 589, 71 L. Ed. 1323. Third, it is said that whatever else was done was incidental to the enforcement of the judgment against the Denver Company, and that to enforce a judgment is not to conduct business. Thus all that was done is removed from the realm of business by an analytical process which exalts the form. and ignores the substance. The argument must yield to reality.

Viewing the transactions as a whole, there can be no doubt that the plaintiff was constantly engaged in pursuing the purposes for

which it was organized as a business corporation, was continuously exercising the highest degree of business judgment, and was constantly making decisions involving financial success or failure in innumerable business transactions. It may very well be that the enforcement of a simple judgment for money damages does not involve what is ordinarily meant by the term "doing business." The judgment creditor places an execution in the hands of the sheriff, and by the process of levy and sale the debt is collected and paid. But where, as in this case, the collection of the debt involves constant activity, not only in the conduct of proceedings looking to the levy of process and the sale of property thereunder, but to the protection of the judgment creditor's interests upon the sale, involving large financial transactions, the negotiation of substantial credits, the purchase of extensive properties, the negotiation and execution of plans for their reorganization, the incorporation of companies to operate these properties, and all of the varied activities disclosed by the record in this case, it can hardly be said that, in the doing of these things, the judgment creditor does not engage in business within the very general sense of the statute. What was done is well within the definition approved in Flint v. Stone Tracy Co., 220 U. S. 107, 31 S. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312:

" 'Business' is a very comprehensive term and embraces everything about which a person can be employed. Black's Law Dict. 158, citing People v. Commissioners of Taxes, 23 N. Y. 242, 244. "That which occupies the time, attention and labor of men for the purpose of a livelihood or profit.' Bouvier's Law Dictionary, vol. 1, p. 273."

The rule is stated in Von Baumbach v. Sargent Land Co., 242 U. S. 503, 37 S. Ct. 201, 61 L. Ed. 460:

"It is evident, from what this court has said in dealing with the former cases, that the decision in each instance must depend upon the particular facts before the court. The fair test to be derived from a consideration of all of them is between a corporation which has reduced its activities to the owning and holding of property and the distribution of its avails and doing only the acts necessary to continue that status, and one which is still active and is maintaining its organization for the purpose of continued efforts in the pursuit of profit and gain and such activities as are essential to those purposes."

In Edwards v. Chile Copper Co., 270 U. S. 452, 455, 46 S. Ct. 345, 346 (70 L. Ed. 678), it was said:

"The exemption 'when not engaged in business' ordinarily would seem pretty nearly equivalent to when not pursuing the ends for which the corporation was organized, in the cases where the end is profit."

It cannot be said that reorganizing the corporate and financial structure of a great railroad system is not "business" of the highest importance. Looking through formal rights and relationships, it is apparent that it was for this that the plaintiff was organized. The Western Pacific was only a part of a great railroad system, and, unless the Denver properties could be reorganized and retained as an integral part thereof, the reorganization was but half accomplished. When the plaintiff corporation was organized, it was apparent that the enforcement of the bondholders' claims against the Denver Company would probably involve the reorganization of that company. The plaintiff corporation was the corporate instrumentality utilized for the accomplishment of this purpose, and this purpose clearly characterizes the activities in which the plaintiff engaged. It is not consistent with reality to say that all it was doing was to enforce a judgment. It furnished the brain and financial resources by which the ultimate reorganization of the Denver properties was accomplished and the integrity of the entire system assured upon a reorganized financial basis. The innumerable transactions in which it engaged preceding the accomplishment of this result were transactions of a strictly business nature. If what it did was not business within the general sense of the statute, it is difficult to imagine what is. I think it may be said with certainty of conviction that a very much stronger showing of business activity is presented than was presented in Phillips v. International Salt Co., supra, as an examination of the record and of the opinion of the Circuit Court of Appeals for the Third Circuit (9 F.[2d] 389) in that case will disclose.

Result is that the complaint herein must be dismissed. If either party desires to do so, special findings of fact may be proposed within ten days.