## AMERICAN INV. SECURITIES CO. v. UNITED STATES.
### No. 7002.

District Court, D. Massachusetts.
Jan. 16, 1939.

F. H. Nash (of Choate, Hall & Stewart), of Boston, Mass., for plaintiff.

John A. Canavan, U. S. Atty., and C. Keefe Hurley, Asst. U. S. Atty., both of Boston, Mass.

FORD, District Judge.

This is a suit to recover the sum of $5,302 with interest, paid as capital stock excise taxes for the fiscal years ending June 30, 1933, 1934, 1935 and 1936. Claims for exemption from these taxes were duly filed on the ground that the petitioner (hereinafter called the "Securities Company") was not doing business within the meaning of the applicable Revenue Acts during the period beginning June 16, 1933. The exemptions were denied, the taxes assessed and paid, claims for refund were filed and rejected, and this suit followed.

The sole question involved is whether the Securities Company during the tax years in question was carrying on or doing business within the meaning of Section 215 of the National Industrial Recovery Act, c. 90, 48 Stat. 195, 207; Section 701 of the Revenue Act of 1934, c. 277, 48 Stat. 680, 26 U.S.C.A. § 1358); Section 105 of the Revenue Act of 1935, c. 829, 49 Stat. 1014, 1017; and Section 401 of the Revenue Act of 1936, c. 690, 49 Stat. 1648, 1733, 26 U.S.C.A. § 1358a.

Section 215 of the National Recovery Act reads as follows:

"(a) For each year ending June 30 there is hereby imposed upon every domestic corporation with respect to carrying on or doing business for any part of such year an excise tax of $1 for each $1000 of the adjusted declared value of its capital stock. * * *

"(c) The taxes imposed by this section shall not apply * * *

"(3) to any domestic corporation in respect of the year ending June 30, 1933, if it did not carry on or do business during a part of the period from the date of the enactment of this Act to June 30, 1933, both dates inclusive. * * *"

The other applicable provisions are similar to Section 215 of the National Recovery Act, except for minor changes, of no importance in this case.

It is agreed by the Securities Company that if it were doing business at all after June 15, 1933, it was doing business during the entire period involved here and the taxes were properly assessed and collected.

Statements of fact and conclusions of law appearing herein are intended to meet the requirements of Rule 52 of the new Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

The facts as contained in a stipulation filed by the parties and adopted here, and those found by me, are as follows:

The petitioner is a Maine corporation with its principal office in Boston, Massachusetts, and was organized in March, 1901, with a charter that permitted it to engage in any sort of business except bank-

ing. It was organized for the purpose, among others, of buying, holding, selling, dealing in or with bonds, stocks, and securities of all kinds. It practically did no business until The Columbian National Life Insurance Company (hereinafter called "Insurance Company"), was incorporated under a special act of the Massachusetts Legislature in June, 1902, St. Mass.1902, c. 447. Between the years 1902 and 1906 it engaged in the business of financing the Insurance Company through an intermediate company known as the American Agency Company, which became insolvent in the latter year. It then undertook to finance the Insurance Company under the terms of a contract dated December 5, 1906. The contract with the Insurance Company provided that the Securities Company was to make an initial payment of $250,000 to the former, which it did. The Securities Company obligated itself to use its best efforts in the advancement of the interests of the Insurance Company, to solicit and obtain contracts of life insurance wherever the Insurance Company should so request, and to make no contract for its services with, or act for, any other Company engaged in the business of life insurance. The Securities Company was to pay all the necessary expenses of the Insurance Company up to September 11, 1932, when the obligation of the Securities Company to finance the Insurance Company was to end. The Insurance Company agreed on its part to pay back the amount of all monies advanced by the Securities Company up to September 11, 1932, in the manner disclosed by the terms of the contract. In accordance with the terms of the contract the Securities Company was to receive as profit for its services a certain percentage of the premiums to be paid on all policies in force on the date of the expiration of the contract, September 11, 1932. This amounted to 42½ per cent of the "loadings" on the policies or about 10 per cent of the gross premiums received. The contract was carried out in accordance with its terms; the Securities Company ceased to finance the Insurance Company after September 11, 1932, and continued under the terms of the contract to receive during the tax years in question the benefits or profits above described.

In addition to financing the Insurance Company, an enterprise which involved large sums of money, the Securities Company in the year 1911 acquired, for the benefit of the Insurance Company, a Colorado insurance company which was amalgamated to the Insurance Company at a cost of $415,000 to the Securities Company. There was no dispute that during the life of the contract the Securities Company solicited contracts of life insurance on behalf of the Insurance Company. When the stock of the Insurance Company was put out in 1903, the capital of the Insurance Company then being $200,000, the Securities Company acquired all the stock, and when the capital of the Insurance Company was increased in 1906 to $1,000,000, the Securities Company purchased enough additional shares to hold control of the Insurance Company, and again when the capital stock was increased in 1924 and 1927 more stock was purchased until on September 11, 1932, the Securities Company owned about 71 per cent of the total issue, 14,200 of a total of 20,000 shares. Between September of 1932 and June 30, 1936, the taxable years in question, it increased its holdings of stock to 73 per cent of the total and from that time on acquired about 2 per cent more of the stock, so that at the present time it owns 75 per cent, and it was admitted by the treasurer of the Securities Company that it is the present intention to continue to take whatever other stock is offered in the years to come. The value of the stock of the Insurance Company on December 31, 1932, was $2,068,210.35 and on December 31, 1936, the value was $2,111,674.79. It had assets during the tax years in question of a book value of more than $3,800,000 and maintained a surplus of $650,000 with no bonded indebtedness. Its income during the tax years amounted approximately to $250,000 for each year. In addition to this the Securities Company had invested its funds in the stocks of various trust companies, insurance companies, and commercial organizations, and the total value of these investments held by the Securities Company during the tax years was about $2,300,000, which amount was approximately two-thirds of the total assets of the Securities Company. The officers of both the Securities Company and the Insurance Company were practically identical and the major salaries of these officers were paid by the Insurance Company. Originally the Securities Company occupied offices of its own but in 1912 moved into offices of the Insurance Company. Because of the interlocking officers, management and control of the Insurance

Company by the Securities Company the latter kept no books of its own. Stockholders and directors meetings of the Securities Company were regularly held during the tax years and dividends were paid during this period at regular intervals to the stockholders. The Securities Company kept its corporate organization intact after September 11, 1932, small salaries were paid to its officers, and at no time did it make any attempt to liquidate its affairs. The Insurance Company is in active business today and the Securities Company still holds about 75 per cent of the total shares of stock.

Before we decide the question in issue here, it might be well to look for some guiding principle in some of the decided cases. It would be mere duplication to review them all as the reports are replete with decisions on this subject from Flint v. Stone Tracy Company, 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas. 1912B, 1312, which decided that the capital stock tax is an excise tax imposed upon corporations engaged in business activities and enjoying advantages inherent in corporate organizations. In that case the Court said, " 'business' is a very comprehensive term and embraces everything about which a person can be employed," (220 U.S. page 171, 31 S.Ct. page 357, 55 L.Ed. 389, Ann.Cas.1912B, 1312), and quoted with approval the definition of "business" as found in 1 Bouv. Law Dict., Rawle's Third Revision, p. 406, as "that which occupied the time, attention, and labor of men for the purpose of a livelihood or profit." The Supreme Court of the United States has found it necessary to depart from the letter of this definition of business in its decisions of cases presenting varying facts and as a result it is extremely difficult to determine where the dividing line lies between doing and not doing business within the meaning of the Revenue Acts. After a study of the appropriate cases, I find at one point a liberality in extending exemption from the tax and later on a restriction of the range of exemption and the conclusion is compelled as many of the cases point out that each case rests upon its own facts. Von Baumbach v. Sargent Land Company, 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460.

Judge Hand in the case of Argonaut Consolidated Mining Company v. Anderson, 2 Cir., 52 F.2d 55, 56, discusses the dividing line as follows:

"Just what activities bring a corporation within the statutory definition the decisions, as is almost inevitable, do not certainly declare. That there is a degree of quietude which will exempt it, is indeed well settled. (Zonne v. Minneapolis Syndicate, 220 U.S. 187, 31 S.Ct. 361, 55 L.Ed. 428; McCoach v. Minehill, etc., Co., 228 U.S. 295, 33 S.Ct. 419, 57 L.Ed. 842; United States v. Emery, etc., Co., 237 U.S. 28, 35 S.Ct. 499, 59 L.Ed. 825; Eaton v. Phoenix Securities Co. [2 Cir.], 22 F.(2d) 497; Rose v. Nunnally Co. [5 Cir.], 22 F. (2d) 102); but how far it may be active and still maintain its exemption, is in the nature of things impossible of statement in general terms. In most of those cases in which the corporation has succeeded its activities have been confined to holding the title of property, whose usufruct it receives and distributes in dividends. When this is the whole scope of its dealings, it does no business within the meaning of the statute.

"However, it takes little to bring it from behind this shield."

The Court in Von Baumbach v. Sargent Land Company, supra (242 U.S. page 516, 37 S.Ct. page 204, 61 L.Ed 460) said: "The fair test to be derived from a consideration of all of them is between a corporation which has reduced its activities to the owning and holding of property and the distribution of its avails and doing only the acts necessary to continue that status, and one which is still active and is maintaining its organization for the purpose of continued efforts in the pursuit of profit and gain, and such activities as are essential to those purposes."

In the case of Edwards v. Chile Copper Company, 270 U.S. 452, 455, 456, 46 S.Ct. 345, 346, 70 L.Ed. 678, Mr. Justice Holmes in refusing to grant exemption from the tax to a corporation organized for the purpose of holding the stock of a mining corporation, and of issuing and selling bonds secured by pledge of the stock and furnishing the proceeds from time to time to the other to enable it to carry on its work, other activities of the holding company consisting of maintaining an office, voting the shares, electing directors, etc., stated: "It was organized for profit and was doing what it principally was organized to do in order to realize profit. The cases must be exceptional, when such activities of such corporations do not

498

amount to doing business in the sense of the statutes. The exemption 'when not engaged in business' ordinarily would seem pretty nearly equivalent to when not pursuing the ends for which the corporation was organized, in the cases where the end is profit."

Here we find the field of exemption much narrowed. The case of Harmar Coal Company v. Heiner, 3 Cir., 34 F.2d 725, 728, laid down the following test: "that when a corporation is organized for one definite purpose, the ultimate object of which is profits, and it engages in the business of effectuating that purpose and then stops the business by reason of sale, lease, or other action, and thereafter simply hangs on, in a corporate sense, receiving and distributing the avails of its re-organized affairs, it is not doing business. On the other hand a corporation, organized for a definite though limited business purpose involving profits, that pursues activities to carry out that purpose, no matter how few or small they may be, is carrying on or doing business within the meaning of the statute."

The purposes of the plaintiff Securities Company in this case are to "buy, hold, sell, deal in or with, in any lawful manner, on commission, or otherwise, bonds, stocks, * * * and securities of all kinds. * * *" As disclosed by the facts appearing above after the contract with the Insurance Company was entered into in exercise of a portion of the power granted by the charter which resulted in its financing that company from 1906 to 1932, in accordance with other specific powers granted by its charter the Securities Company purchased up to the end of 1936, 73 per cent of the Insurance Company's corporate stock. Up to 1932 and continuing during the taxable years to the end of 1936 it was carrying out part of the purposes for which it was organized. In 1932, as appears above, it owned 14,200 shares out of a total of 20,000 shares of the Insurance Company stock and between 1932 and the end of 1936 it purchased for investment 2 per cent of the Insurance Company stock, approximately 400 shares at a cost of upwards of $35,000.

In conclusion we have in this case a corporation which admittedly engaged in carrying on a very extensive business up to September 11, 1932, within the powers granted by its charter, and during the tax years ready at a moment's notice to enter into any enterprise for profit within those powers. Before this date and indeed after this date and during the tax years in question it did what it was organized to do and what its charter contemplated it would do, i. e., invest in and hold stocks of other corporations, in this case for the most part in stock of an insurance company in which it put almost two-thirds of its total assets. It did not during the taxable years retire from the business of investment in the stocks of other companies. It maintained its corporate organization for the purpose of continued efforts in the pursuit of profit and gain (Von Baumbach v. Sargent Land Company, supra), held directors meetings and voted the stock which it held in the Insurance Company for the purpose, which it accomplished, of controlling, directing, and managing the affairs of the Insurance Company, thus affording protection for its investment in this stock and also its profits arising from its contract with the Insurance Company which were still flowing to it during the tax years. Certainly this and its purchase of further stock in the Insurance Company between the years 1932 and 1936, inclusive, was no indication that it had retired from the business for which it was organized. It was this investment in the stock of the Insurance Company that enabled it to obviate the necessity of maintaining a very extensive organization to determine and protect these profits. And it was this control that enabled it to pay small, rather than large, salaries to its officers, the latter receiving the major part of their compensation from the Insurance Company.

The facts in this case warrant the conclusion that the taxpayer was doing business within the meaning of the statute during the taxable years. In fact, it does not appear to me that there was, on the part of the petitioner, even a temporary pause from carrying on business. And even if there was a temporary pause, I do not understand it to be the law that a corporation, as the petitioner in this case, which had admittedly pursued the business purposes for which it was organized up to a certain date, and, maintaining its corporate organization, and with no intention of liquidating, limits its activities in its particular corporate field for the purpose of consolidating and conserving its gains, or because it has sufficiently accomplished, for the time being, the purposes for which it was organized, or because of

financial inability, or decision for any other reason not to expand further its activities in its own field, can be said not to be "carrying on business" within the meaning of the statute during such temporary curtailment.

In the language of Mr. Justice Holmes in the case of Edwards v. Chile Copper Company, supra, "It was organized for profit and was doing what it principally was organized to do in order to realize profit."

Its maintenance of a surplus of $650,000 is "not evidences of a dormant corporation." United States v. Atlantic Coast Line Company, 4 Cir., 99 F.2d 6, 9. It is not a trust holding securities for the purpose of liquidation. White v. Hornblower et al., 1 Cir., 27 F.2d 777. It is not practically a bare holding company, as was the case in Eaton v. Phoenix Securities Company, supra. It had not parted with control and management of its property, i. e., the stock in the Insurance Company in which it had invested, and practically gone out of business. Zonne v. Minneapolis Syndicate Company, supra.

The present case is nearer to the cases of Phillips v. International Salt Company, 274 U.S. 718, 47 S.Ct. 589, 71 L.Ed. 1323; Harmar Coal Company v. Heiner, supra; New Haven Securities Company v. Bitgood, 2 Cir., 87 F.2d 759; United States v. Atlantic Coast Line Company, supra; Page et al., Ex'rs, v. M. Rich & Bros. Company, 5 Cir., 99 F.2d 607.

Ultimate compensation would be afforded to courts dealing with this type of case, where a "twilight zone" of exemption has been established, if, heeding the warning of the Supreme Court in the case of Phillips v. International Salt Company, supra, and Edwards v. Chile Copper Company, supra, to narrow the range of exemptions, they kept in mind the definition of "carrying on business" which was adopted in the case of Flint v. Stone Tracy Company, supra, and adhered as closely to that definition as the individual facts of each case would warrant.

The plaintiff's motion for judgment is denied. The defendant's motion for judgment is granted, with costs, in accordance with the above opinion.

The requests of the parties for findings of fact and conclusions of law, so far as they are consistent with the above, are granted, and, to the extent that they differ from the above findings and conclusions, they are denied.