### CHEMUNG IRON CO. v. LYNCH, Collector of Internal Revenue.

(Circuit Court of Appeals, Eighth Circuit. December 6, 1920.)

No. 5572.

Internal revenue ⬤═9—Corporation, receiving royalty from subleased ore lands, "doing business"; "income."

A corporation, lessee of iron ore lands, which subleased the same for mining purposes, receiving a royalty, and which employed an engineer to supervise the work of the sublessee and expended money in exploration to make sure that all available ore in the land was mined, *held* to have been "doing business," within the meaning of Corporation Tax Act Aug. 5, 1909, and to be subject to tax thereunder on the net receipts from such royalties as "income."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Doing Business; Income.]

In Error to the District Court of the United States for the District of Minnesota; Page Morris, Judge.

Action by the Chemung Iron Company against Edward J. Lynch, Collector of Internal Revenue. Judgment for defendant, and plaintiff brings error. Affirmed.

A. L. Agatin, of Duluth, Minn., for plaintiff in error.

Alfred Jaques, U. S. Atty., of Duluth, Minn., for defendant in error.

Before SANBORN and CARLAND, Circuit Judges, and MUNGER, District Judge.

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

CARLAND, Circuit Judge. Action by plaintiff in error, hereafter called iron company, to recover from defendant in error, hereafter called collector, corporation excise taxes paid under protest. The case was tried to the court, a jury being waived. At the close of the evidence, counsel for iron company requested the court to declare the law in its favor. The request was denied, and a judgment rendered in favor of the collector.

It appears from the pleadings and evidence without dispute that for the years 1909, 1910, and 1912 the Commissioner of Internal Revenue assessed corporation excise taxes under the Corporation Excise Tax Law of 1909 (36 Stat. 11, 112), against the iron company, amounting in the aggregate to $12,923.83; that said taxes were paid under protest, and subsequently an application for a refund was made in accordance with the provisions of section 3226, Rev. Stat. (Comp. St. § 5949), and denied; that plaintiff did no business and received no income, gross or net, within the meaning of the above tax law, during the years aforesaid, unless certain acts performed by the iron company pursuant to the terms of a contract entered into with the Oliver Mining Company, hereafter called mining company, constituted the doing of business and the receipt of income. On January 1, 1903, the iron company, as stated in the brief by its counsel—

"was the owner of several mining leases (about 11 in number) covering various parcels of lands in St. Louis county, Minn., and each of which provided substantially that the owners of the property demised the lands covered by the respective instruments for the purpose of exploring for, mining, and removing the merchantable iron ore which might be found therein, for and during a specified period varying from 25 to 50 years from the date of the instruments, respectively, giving the lessee exclusive right to occupy and control the demised premises and to erect all necessary buildings, structures, and improvements thereon; the owners, however, reserving the right to enter for the purpose of observing the operations from time to time, and of measuring the amount of ore mined and removed, in such manner as would not interfere with the work of the lessees; the lessee in each of said mining leases agreed to pay the owners a certain price or royalty per ton for all iron ore mined or removed from the premises, and to make such payments at certain intervals; the lessee further agreeing to mine and ship a specified quantity of ore in each year, and, if for any reason the agreed amount should not be mined and shipped, nevertheless to pay the owner for the minimum amount so specified, and to take credit therefor and apply any sums so paid for ore not actually mined and shipped upon ore mined and shipped thereafter in excess of such minimum. In the event of default by the lessee in the observance of their contract obligations, the owners are entitled at their election, after due notice to the lessee to remedy the default, to terminate the contracts."

"The iron company, being the owner of said 11 leasehold estates, did on January 1, 1903, enter into a contract with the mining company, by the terms of which it subleased to said mining company all the lands covered by said leases for the entire terms of which they had been leased to it, except in each case the nominal period of the last day or two of the original leasehold period, for the purpose of permitting the mining company to do, in and upon the several parcels of land so demised, all and every the acts and things, but no more, which the iron company was entitled to do by said underlying leases."

In said lease the mining company covenanted to observe the underlying leases and contracts, to exhaust the merchantable ore bodies, to operate the mines in accordance with the requirements of good engi-

neering, to not waste ore, to furnish fee owners reports and maps to furnish the iron company duplicate and monthly reports of shipments, to permit the iron company to have access to the premises of the mining company, to pay taxes, to furnish tax receipts, to not assign or sublet demised premises, to permit entry of premises by the iron company, to deliver annual reports of exploration to the iron company, and to pay the iron company a royalty of 50 cents on each gross ton of iron ore mined and removed from the demised premises under and by virtue of the terms of the lease. Said lease also contained the following provisions:

"That the Chemung Company may at all times enter upon said premises or any part thereof, and view the same and take all reasonable means to ascertain the condition thereof, and the quantities of iron ore removed therefrom, or remaining therein, and to that end it may at any time, and from time to time, explore by drills or otherwise any and all of said premises, but not so as to unreasonably or unnecessarily hinder or interrupt the proper business or operations thereon of the Oliver Company."

"Therefore the parties hereto agree that, if either of the parties hereto shall serve a written notice upon the other, stating that the then merchantable iron ore bodies in any of the parcels hereby demised are practically exhausted, a mining engineer selected by each of the parties hereto shall within 60 days thereafter carefully examine and inspect such premises. * * *"

"To the end aforesaid the Chemung Company will, during the first five years of this lease, explore the demised premises for iron ore, and will from time to time, as requested, but not oftener than once a month, furnish the Oliver Company with all the results of such explorations, and will at all times permit the Oliver Company to examine such work of exploration and ascertain its nature and results, but not in such a manner as to interfere therewith; and the Oliver Company will from time to time as requested, but not oftener than once a month, furnish the Chemung Company with all the results of any explorations of said premises it may make, and with all the information it may acquire in its mining operations thereon, tending to show the quantity and quality of iron ore therein."

It appears from the evidence in the case that during the years 1909, 1910, and 1912 the iron company employed a secretary at a salary of $100 per month, a bookkeeper at a salary of $75 per month, and a mining engineer at a salary of $2,450 per year. The engineer was engaged by the iron company to superintend or inspect mining operations carried on by the mining company under its lease. Said engineer visited the mines from time to time, and reported to the iron company, in order that it might be advised whether the mining company was carrying out the terms of the lease.

The iron company expended, during the years 1909, 1910, and 1912, $59,898 in exploring the leased lands for its own advantage, profit, and gain. The evidence also shows that the nature of the business to be carried on by the iron company, as shown by its articles of corporation, was that of mining, smelting, reducing, refining, and working iron ores and other minerals. On this state of the record, counsel for the iron company contends that said company, during the years 1909, 1910, and 1912, was not doing business, and that the money paid to and received by it from the mining company under and pursuant to the contract of lease was not income, gross or net, within the meaning of the Corporation Tax Law. A plausible argument is made by

counsel for the iron company in support of said contentions, but we are unable to distinguish in principle the present case from that of Von Baumbach v. Sargent Land Co., 242 U. S. 503, 37 Sup. Ct. 201, 61 L. Ed. 460. It was stated in the case cited that the employment by the Sargent Land Company of another company to see that the mining operations were properly carried out and that the lessees lived up to the terms of their contracts was doing business, and that no particular amount of business was necessary in order to bring the company within the terms of the Corporation Tax Law. The exploration by the engineer of the iron company was to make sure that all ore that was in the leased land was extracted, and of course the work was done for the purpose of profit, as no company would expend the amount of money that the iron company did without intending to make a profit. The contention of counsel for the iron company that the royalties received by it under the lease were not income, within the meaning of the Corporation Tax Law, is also ruled against said company by the case above cited. The contention of counsel resolves itself into the proposition that the royalties received under the lease by the iron company constituted the conversion into money of what was its capital on January 1, 1903. In regard to this contention we need only to quote from the opinion in the case above cited as follows:

"This court held that it was not correct to say that a mining corporation was not engaged in business, but was merely occupied in converting its capital assets from one form to another, and that while a sale outright of a mining property might be fairly described as a conversion of the capital from land into money, the process of mining is, in a sense, equivalent to a manufacturing process, and however the operation shall be described, the transaction is indubitably 'business' within the meaning of the act of 1909, and the gains derived from it are properly the income from business, derived from capital, from labor, or from both combined. Further, 'as to the alleged inequality of operation between mining corporations and others, it is, of course, true that the revenues derived from the working of mines result to some extent in the exhaustion of the capital. But the same is true of the earnings of the human brain and hand when unaided by capital, yet such earnings are commonly dealt with in legislation as income. So it may be said of many manufacturing corporations that are clearly subject to the act of 1909, especially of those that have to do with the production of patented articles; although it may be foretold from the beginning that the manufacture will be profitable only for a limited time, at the end of which the capital value of the plant must be subject to material depletion, the annual gains of such corporations are certainly to be taken as income for the purpose of measuring the amount of the tax.'

"It is contended that this case is inapplicable, because the facts disclose that the ores were being mined by a corporation upon its own premises. In our view, this makes no difference in the application of the principles upon which the case was decided. We think that the payments made by the lessees to the corporations now before the court were not in substance the proceeds of an outright sale of a mining property, but, in view of the terms of these instruments, were in fact rents or royalties to be paid upon entering into the premises and discovering, developing, and removing the mineral resources thereof, and as such must be held now, as then, to come fairly within the term 'income' as intended to be reached and taxed under the terms of the Corporation Tax Act.

"The prior decisions of this court in Stratton's Independence v. Howbert, 231 U. S. 399, and Stanton v. Baltic Mining Company, 240 U. S. 103, in which the Stratton Case was followed and approved, are decisive of this question."

Counsel for the collector made a motion for judgment on the pleadings in the court below, which was denied. The claim of counsel was that the collector in the case at bar was not the collector in office when the taxes were collected. The judgment' below was in favor· of the collector, and he of course did not sue out a writ of error; nevertheless counsel has argued the point here for the purpose of maintaining that the judgment below was right in any event. In view, however, of the state of the record and our affirmance of the judgment on the merits, we decline to consider the ruling complained of.

Judgment affirmed.