## CLALLAM LUMBER CO. v. UNITED STATES (two cases).

District Court, W. D. Michigan, S. D. June 3, 1927.

Nos. 3208, 3209.

See, also, 34 F.(2d) 947.

Butterfield, Keeney & Amberg, of Grand Rapids, Mich., for plaintiff.

E. J. Bowman, Dist. Atty., of Grand Rapids, Mich., for the United States.

RAYMOND, District Judge. The essential facts in the above cases are practically undisputed. It was stipulated in open court that the testimony received in case No. 3208 should be considered as the evidence in case No. 3209. By these suits plaintiff seeks to recover capital stock taxes paid by it under protest, which were levied under section 1000 of the Revenue Act of 1921 (42 Stat. 294), for the years ending June 30, 1923, and June 30, 1924; the amounts paid being $8,528 and $8,030, respectively. The sole question presented is whether plaintiff was, during the taxable periods involved, namely, July 1, 1921, to June 30, 1922, and July 1, 1922, to June 30, 1923, carrying on or doing business, within the meaning of this section of the Revenue Act.

The test to be applied in this class of cases was stated by Justice Day in the case of Von Baumbach v. Sargent Land Co., 242 U. S. 503, 516, 37 S. Ct. 201, 204, 61 L. Ed. 460, as follows: "It is evident, from what this court has said in dealing with the former cases, that the decision in each instance must depend upon the particular facts before the court. The fair test to be derived from a consideration of all of them is between a corporation which has reduced its activities to the owning and holding of property and the distribution of its avails, and doing only the acts necessary to continue that status, and one which is still active and is maintaining its organization for the purpose of continued efforts in the pursuit of profit and gain, and such activities as are essential to those purposes."

The salient evidence in this case may be summarized as follows:

Clallam Lumber Company was incorporated under the laws of Michigan in June, 1910, with a capital stock of $2,100,000, $2,006,131 of which was paid in by conveyances to the corporation of about 41,000 acres of timber lands situated in Clallam county, Wash., which for a number of years prior thereto had been owned by the respective incorporators as individuals. The purposes of the corporation are thus stated in the articles:

"To manufacture lumber, shingles, wood pulp, and all wood or forest products; to buy and sell lumber, timber, shingles, wood pulp, bark, and all wood or forest products; to own, hold and sell such real estate as is convenient or necessary to the carrying on of the lumber and timber business. In connection with the lumber and timber business, to carry on a store for the sale of general merchandise, and to own and operate tugs and steamers for towing logs. Such business to be carried on either in Michigan or elsewhere."

It appears from the testimony, however, that the prime reason for incorporating was to make it possible to sell the lands to greater advantage; their marketability having been affected adversely by the fact that the various individual holdings were interlaced with each other in such manner as to make the consummation of advantageous sales a matter of difficulty. None of the purposes of the corporation, as recited in the articles, has been carried into effect. It is contended by the government that plaintiff, during a large portion of the period since its incorporation, has been engaged in a well-recognized form of business activity, namely, that of speculating in timber lands, involving the purchase of such lands, the holding thereof until a satisfactory price is received, the protection of the timber from fire and trespass, and the ultimate sale thereof.

On the other hand, it is contended by plaintiff that its activities have related merely to the ownership and preservation of its timber lands, with the view of liquidating its capital assets and distributing the proceeds among its stockholders as soon as a fair price therefore could be obtained. It is claimed that this statement is especially true of the taxable period involved in the assessment of the taxes in dispute.

The question here presented, therefore, is whether the activities of plaintiff during the taxable period were related merely to the use of reasonable and proper means for carrying out a purpose to liquidate its properties, or are indicative of a purpose to engage in the business of speculating in timber lands in the pursuit of profit and gain; in other words, what is the essential purpose for which plaintiff is maintaining its organization? To some extent the purpose may be inferred from corporate acts prior to the taxable periods. The activities principally relied upon by defendant as indicative of a purpose to "carry on business" are as follows:

(a) During the first three or four years of the existence of the corporation, several small parcels of land were purchased at a cost of about $20,000; the parcels so acquired being interspersed with lands owned by the corporation. It was therefore thought best to consolidate the holdings of the company and to eliminate the additional fire hazard which would result from having settlers upon parcels of land owned by others.

(b) In the year 1918, a piece of land was purchased at a price of about $20,000, the land purchased being available for a mill site or railway terminal. It was believed that acquisition of this property would facilitate the sale of the adjacent timber lands.

(c) In 1918, plaintiff expended a small sum of money to acquire the land between high-water and low-water mark on the shores of Lake Pleasant, for the purpose of perfecting and protecting the title to the shore lands and to facilitate sale thereof.

(d) During the year 1918, a railroad, known as the Spruce Production Railroad Company, was built on behalf of the United States government across a portion of plaintiff's lands for use by the government in securing spruce lumber for use in the manufacture of airplanes. The government thereafter paid plaintiff for the right of way and for the timber removed.

(e) In January, 1921, plaintiff sold to Larson Lumber Company 12,181 acres of land at an agreed price of $2,500,000. At or about the time of the completion of the contract a hurricane destroyed much of the timber, and a suit was brought by the purchaser to rescind the contract. A cruise of the tract was made, to ascertain the extent of the damage. This resulted in a compromise settlement, and a supplemental contract was made on November 4, 1921, whereby the purchase price was abated to the extent of $500,000. The payment of the purchase price of $2,000,000 was agreed to be made in installments extending over a period of about 10 years, and the agreed payments have been made each subsequent year, a portion of the proceeds being used to pay expenses incident to fire protection, the salary of the caretaker, and taxes, and the remainder has been distributed among the stockholders.

(f) About November 17, 1921, plaintiff borrowed the sum of $15,000 from one of its stockholders, the corporation being short of funds because of the pending litigation with the Larson Lumber Company.

(g) In May, 1921, the plaintiff loaned Mr. Rixon, a caretaker, the sum of $4,000 as an accommodation, he having sustained property damage by reason of the hurricane.

(h) During 1922, plaintiff employed an engineer to investigate as to the possibility of constructing a railroad from its lands, either to Clallam Bay or to the Pysht river, to enable possible purchasers of timber lands to procure an outlet.

(i) During 1922 and 1923, two options to purchase lands were given by plaintiff, neither of which was exercised.

The foregoing, with the exception of a few unimportant transactions of the same general nature, constitute all of the business activities of the Clallam Lumber Company since its incorporation, and through the taxable periods involved in this litigation, with the exception of such activities as were obvi-

ously incident to the continuance of corporate existence and the protection of the property from fire hazards, such as holding corporate meetings, the employment of a caretaker, who lived on the property, and the use of local counsel to attend to the interests of the corporation in matters of local taxation.

The question of liability in this case must be decided by determining the purposes for which the corporate organization was maintained. This purpose must be ascertained from the acts of the corporation and the declarations of those authorized to speak for it. The testimony as to purpose is to the effect that there was never any intention to carry out the corporate objects as stated in the articles of association, or to carry on any active enterprise, and that the sole purpose of the corporation was to hold the timber lands and effect a sale thereof as soon as a fair price could be obtained, the proceeds to be distributed to stockholders. This testimony is, of course, not controlling, if the acts of the corporation above set forth were such as to satisfy a court that the real purpose was not in accordance therewith.

It must be remembered that plaintiff is the owner of 41,000 acres of land, of a value in excess of $6,250,000, and that it has been in existence for about 17 years. Comparison of its actual activities and transactions during that long period with those which were authorized by its articles, and which would have transpired, had the company sought to profit from the use of its capital, makes it apparent that the acts of the corporation have been in consonance with the verbal testimony as to the purpose of maintaining the organization. Had the various activities relied upon by the government been for the purposes of speculation for profit or gain, the fact that they were of comparatively small importance would not affect liability in this case; but the direct testimony, which is amply sustained by the surrounding facts and circumstances, is to the contrary. The use which was made of the proceeds of the sale to the Larson Lumber Company suggests liquidation, and not continued existence for speculation.

Sales of capital assets for distribution of proceeds among stockholders deny the conclusion that the organization was maintained "for the purpose of continued efforts in the pursuit of profit and gain." Doing business necessarily involves the pursuit of gain through commercial activity, and should be distinguished from profit derived from the sale of capital assets, which results solely from enhanced market value. Purchase of lands by plaintiff with the expectation that they could be resold at a profit, and with that purpose in view, would support the claim of the government. The evidence in this case, however, is to the effect that such purchases as were made were for essentially different purposes. In the cases in which liability has been sustained, there has been the element of use of capital assets to produce profit. See Flint v. Stone Tracy Co., 220 U. S. 107, 170, 31 S. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312, Von Baumbach v. Sargent Land Co., 242 U. S. 503, 37 S. Ct. 201, 61 L. Ed. 460, and Edwards v. Chile Copper Co., 270 U. S. 452, 46 S. Ct. 345, 70 L. Ed. 678. In those cases in which the capital assets have been disposed of and the proceeds used for distribution among stockholders, it has been held that no such liability arose. See Zonne v. Minneapolis Syndicate, 220 U. S. 187, 31 S. Ct. 361, 55 L. Ed. 428; United States v. Emery, etc., Co., 237 U. S. 28, 35 S. Ct. 499, 59 L. Ed. 825; Lane Timber Co. v. Hynson (C. C. A.) 4 F.(2d) 666, 40 A. L. R. 1448; Cannon v. Elk Creek Lumber Co. (C. C. A.) 8 F.(2d) 996; United States v. Three Forks Coal Co. (C. C. A.) 13 F.(2d) 631.

Plaintiff's attorneys may submit for approval proposed findings of fact and conclusions of law in each of the above-entitled cases, upon which judgment may be entered for the taxes paid in each case.