## LYON LUMBER CO. v. HARRISON, Collector of Internal Revenue.

### No. 7178.

Circuit Court of Appeals, Seventh Circuit.

June 14, 1940.

444

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and Edward H. Hammond, Sp. Assts. to Atty. Gen., and William J. Campbell, U. S. Atty., of Chicago, Ill., for appellant.

Edward E. Barthell, Jr., of Chicago, Ill., for appellee.

Before EVANS, TREANOR, and KERNER, Circuit Judges.

The defendant appeals from a judgment which directed a refund of $7400.67,[1] and interest, theretofore paid under protest by plaintiff to the Government as capital stock taxes for the years 1933, 1934, and 1935. The basis of the refund .was a finding by the court that plaintiff was not "doing business" and therefore was not subject to a capital stock tax for any of these years.

EVANS, Circuit Judge.

Plaintiff was organized to do lumbering business.[2] Through a 100% owned subsidiary, the Garyville Land Company, it held 32,209.63 acres of cut over swamp land and 77.97 acres of pine lands in Louisiana. It also owned 38,990.92 acres of timber, land in Oregon, acquired through its purchase of the stock of the Continental Timber Land Company. The latter company's stock was held by nearly the same stockholders and in the same relative amounts as the stockholders who owned the stock of plaintiff. Continental owed $900,000 and plaintiff had more than this amount on hand in cash. Plaintiff was an Illinois corporation, organized in 1902. It maintained licenses to hold real estate in Oregon and Louisiana. It had cut practically all the timber on its Louisiana land by 1931 and had ceased lumbering operations there.

Our inquiry is of necessity directed to an examination of the evidence to ascertain whether it supports the court's finding that plaintiff was not doing business in the years in question. The applicable statute reads:

---

[1] 1933 .....................$2230.67
1934 ..................... 2600.
1935 ..................... 2577.

[2] The object for which the plaintiff, Lyon Lumber Company, was formed, under its charter, is as follows:

"To conduct a general lumbering business including the purchase and sale of all kinds of timber and other forest products and the purchase, manufacture and sale of all kinds of forest products including timber, logs, lumber, shingles, lath, ties, posts, poles, staves, bolts, bark, etc., and the business of logging, including the construction and maintenance of all kinds of transportation and other facilities in connection therewith, and also to conduct a boarding house or boarding houses and a general store or stores for the purchase and sale of general merchandise, in connection with said general lumbering business.

"Also to conduct any other business incidental to the aforesaid business or arising out of the management or development of any property acquired in the conduct of said general lumbering business."

Revenue Act of 1934, c. 277, 48 Stat. 680.

"Sec. 701. Capital Stock Tax.

"(a) For each year ending June 30, beginning with the year ending June 30, 1934, there is hereby imposed upon every domestic corporation with respect to carrying on or doing business for any part of such year an excise tax of $1 for each $1,000 of. the adjusted declared value of its capital stock." 26 U.S.C.A. Int.Rev.Acts, page 787.

To refute the finding that plaintiff was not "carrying on business" the Government cites the following facts:

I. Plaintiff executed oil leases on its Louisiana land. The terms of the leases, as they appear from a summary in plaintiff's corporate minutes, are set forth below.[3]

II. Plaintiff sold some second growth timber from its Louisiana land.

III. Plaintiff made some trapping leases on that land.

IV. Plaintiff sold a few tracts of timber land in Oregon.

V. It maintained an office, paid overhead of office, made investments of sizable sums of money.

VI. It maintained licenses to own land in Louisiana and in Oregon.

VII. It authorized its officers and directors each year to borrow money and invest its money as in their judgment seemed wise.

VIII. It maintained arrangements with an experienced sales organization through which it sought to sell its holdings advantageously. It so sold small tracts.

The Government stresses all these items in an effort to apply the legal tests announced by the courts in determining when a company is "doing business."[4]

---

[3] At the last meeting of your Board, Mr. Barthell was authorized to continue his efforts to close a favorable oil lease on the Garyville Land Company holdings. He has succeeded in making such a lease with the Shell Petroleum Corporation. This lease was for an initial consideration of 10¢ per acre or $3,220.-96. On or before nine months from the date of the lease which would be July 17, 1935, the Petroleum Company must commence to drill on each group of 5,000 acres, or failing to do so, pay $3.00 per acre on any lands they wish retained under the lease. This $3.00 payment extends lease rights for twelve months and for each twelve months thereafter, 50¢ per acre is the extension consideration. Various royalties are provided in the lease for the removal of any oil, gas or mineral. Generally speaking, these royalties are one-eighth of production.

[4] Capital Stock Tax Cases Passing on What Constitutes Doing Business: Von Baumbach v. Sargent Land Co., 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460; United States v. Emery, 237 U.S. 28, 35 S.Ct. 499, 59 L.Ed. 825; Zonne v. Minneapolis Syndicate, 220 U.S. 187, 31 S.Ct. 361, 55 L.Ed. 428; McCoach v. Minehill Ry., 228 U.S. 295, 33 S.Ct. 419, 57 L.Ed. 842; Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312; Edwards v. Chile Copper Co., 270 U.S. 452, 46 S.Ct. 345, 70 L.Ed. 678; Cannon v. Elk Creek Lumber Co., 7 Cir., 8 F.2d 996; United States v. Peabody Co., 6 Cir., 104 F.2d 267; Indianiola Co. v. Heiner, D.C., 26 F.2d 733; Stanley Sec. Co. v. United States, Ct.Cl., 38 F.2d 907; Associated Furn. Co. v. United States, Ct.Cl., 44 F.2d 78; Edgar Estates Corp. v. United States, 65 Ct.Cl. 415; Chevrolet Motor Co. v. United States, 64 Ct.Cl. 211; Orpheum Circuit Inc. v. Reinecke, D.C., 41 F.2d 524; Ittleson v. Anderson, 2 Cir., 67 F.2d 323; Carolina, C. & O. Ry. v. Higgins, D.C., 21 F.Supp. 262; Argonaut Cons. Co. v. Anderson, D.C., 42 F.2d 219, 221; Wisconsin Cent. R. Co. v. United States, Ct.Cl. 41 F.2d 870, 885; Stafford Owners v. United States, Ct.Cl., 39 F.2d 743; Del Norte v. Wilkinson, D. C., 28 F.2d 876; Monroe Timber Co. v. Poe, D.C., 21 F.2d 766, 767; United States v. Three Forks Co., 3 Cir., 13 F. 2d 631; Lane Timber Co. v. Hynson, 5 Cir., 4 F.2d 666, 667, 40 A.L.R. 1448; Chemung Iron Co. v. Lynch, 8 Cir., 269 F. 368, 371; Associated Pipe Line Co. v. United States, 9 Cir., 258 F. 800, 804; Harmar v. Heiner, 3 Cir., 34 F.2d 725, 728; Fink C. & C. Co. v. Heiner, D.C., 26 F.2d 136, 137; Western Pac. R. Co. v. Bowers, D.C., 26 F.2d 82, 89; United States v. Hotchkiss Redwood Co., 9 Cir., 25 F.2d 958, 959; Conhaim Co. v. Willcuts, D.C., 21 F.2d 91, 92; Nunnally Inv. Co., v. Rose, D.C., 14 F.2d 189; Three Forks Coal Co. v. United States, D.C., 9 F.2d 946; Page v. M. Rich Co., 5 Cir., 99 F.2d 607; United States v. Atl. Coast Line Co., 4 Cir., 99 F.2d 6; Hastings Pavement Co. v. Hoey, D.C., 28 F.Supp. 897; Colorado Fuel & Iron Corp. v. Nicholas, D.C., 28 F.Supp. 448; Ambergris Cons. Co. v. United States, D.C., 27 F.Supp. 968; American Inv. Sec. Co. v. United States, D.C., 27 F. Supp. 494; Federal Coke Corp. v. Driscoll, D.C., 27 F.Supp. 224; Carnegie-Ill.

Plaintiff, on the other hand, maintains that its corporate activities were those necessary to its awaiting an opportune time for liquidation; that its activities were not "doing business"; that they were foreign to the corporate purposes enumerated in its charter. It insists that all its activities were incidental to the process of its liquidation, which in this instance proceeded slowly because of adverse economic conditions prevalent in the lumber industry since 1930.

Plaintiff relies on the cases which announce a more favorable rule and permits activity to protect assets, without creating a liability for capital stock tax.

Two questions arise preliminarily. What is business? What, "doing business"?

■ We assume that "business" is a most comprehensive term and embraces everything that occupies the time, attention, and labor of men and women for the purpose of earning a livelihood, or profit. 1 Bouv. Law Dict., Rawle's Third Revision, p. 406; Flint v. Stone Tracy Co., 220 U.S. 107, 171, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312. Obviously the size or volume of a corporation's business is not determinative of its "doing business" character. Von Baumbach v. Sargent Land Co., 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460. Large sums may pass through the corporation as a conduit, yet be insufficient to constitute "doing business." Nor may a court ignore any of the corporate activities; they must be judged as a whole. Edwards v. Chile Copper Co., 270 U.S. 452, 46 S.Ct. 345, 70 L.Ed. 678. Likewise the past history of the corporation should be read and studied for the light it may throw on its current doings or its inactivity.

Significant indeed in the instant case is the 1929 purchase of a large tract of land with its heavy timber growth. While holding 32,209 acres of land from which the timber had been removed and a small amount (77 acres) of pine land in Louisiana, plaintiff acquired, through purchase of the stock of the Continental Lumber Co., a timber tract of 39,000 acres in Oregon, with standing timber thereon estimated at two billion feet.

Shortly thereafter it paid an indebtedness of $900,000 borrowed by Continental, which apparently was a lien against this land.

In 1933 the Oregon land was carried by plaintiff on its books at a value of $2,440,-155; its timber footage was 2,000,000,000 feet.

It may be assumed that the 32,209 acres of land in Louisiana, from which plaintiff had removed its timber, were not held for profit or investment. Doubtless plaintiff wished to sell it, but being cut-over land, there was little or no market for it—at least during these trying years.

Naturally plaintiff sought to lessen the loss occasioned by taxes, office expenses, etc., chargeable to this Louisiana property, through a trapping lease, an option for an oil lease, and other minor revenue-producing activities. It sold from this tract, whenever it could—whatever it could. This was all in harmony with its claim that it was not doing business—that its activities were incident to liquidation. As to this Louisiana venture, it was dead, but the interment had not yet occurred. If this were all of plaintiff's activities, we could accept the lower court's finding and disposition of the cause.

But what of plaintiff's purchase in 1929 of 39,000 acres of good timber land in Oregon, carrying 2,000,000,000 feet of standing timber worth $2,500,000 in 1933? This acquisition was as indicative of life and intended activity as the story of transactions in Louisiana pointed to liquidation.

The crash of 1929 and the depths of the depression reached in 1931 and 1932 made the lumber business sick. Plaintiff had but one course open to it. Cut the timber? This was out of the question. Sell the timber? More unthinkable and impossible. The only alternative was to "sit tight." Hold the land. Preserve the timber against fire. Await a better day and keep a look

Steel Corp. v. United States, D.C., 27 F.Supp. 227; Bessemer Coal & Coke Co. v. Heiner, D.C., 26 F.2d 732; Note, 40 A.L.R. 1456; Automatic Fire Alarm Co. v. Bowers, D.C., 51 F.2d 118; Union Land & Timber Co. v. United States, 65 Ct.Cl. 129; Traction Cos. v. Collectors of Int. Rev., 6 Cir., 223 F. 984; Public Serv. Ry. Co. v. Herold, 3 Cir., 229 F. 902; United States v. Nipissing Mines Co., 2 Cir., 206 F. 431; Maxwell v. Abrast Realty Co., 2 Cir., 218 F. 457; Bryant & May v. Scott, D.C., 226 F. 875; Anderson v. Morris & E. R. Co., 2 Cir., 216 F. 83; Lewellyn v. Pittsburgh, B. R. Co., 3 Cir., 222 F. 177; Ward Baking Co. v. United States, 66 Ct.Cl. 456; Eaton v. Phœnix Sec. Co., 2 Cir., 22 F.2d 497; Clallam Lumber Co. v. United States, D.C., 34 F.2d 944.

out for prospective buyers. This land according to plaintiff's witness was purchased for the sole purpose of "holding and selling for profit."

Such were plaintiff's circumstances. Hope was the breath of its life and hope fed on the return of prosperity. With two billion feet of good lumber, plaintiff could not and would not liquidate. That was impossible. It would maintain its offices, its organization, arrange for sale of its land, keep a keen look out for customers, hold its personal property intact, invest and reinvest it, and the profit therefrom would meet (in part at least) the costs of limited activities.

Plaintiff had little choice, it is true. We are however interested, not in the reasons for its choice, but in the *effect* of its choice. It chose not to quit, not to liquidate. So choosing, it remained in the list of corporations who were "doing business." Unhappily its business was neither large nor profitable, but considering the times it was "doing business" as distinguished from "liquidating" or "closing up" its business.

It is quite impossible to conceive of plaintiff's liquidating if the lumber business had "picked up." As its single witness said, it might even, on such a contingency, have undertaken the cutting and selling of the two billion feet of lumber on its Oregon tract. Or if demand grew and prices stiffened, it could and would have proceeded with the plan it had when the tract was purchased; namely, sell at a profit and divide the profits among stockholders.

█ The statute does not permit of a construction of the words "doing business," to depend on the ultimate outcome of the business venture.

There is other evidence which supports this conclusion—keeping a large amount of cash, $250,000, on hand and investing it for profit.

During the years in question plaintiff had on hand approximately $250,000 in cash— over $300,000 at the beginning of the period. This money it invested. Through its investments it sought to make profits as well as to obtain interest returns.

The following excerpts are taken from the minutes of different stockholders' meetings:

"The Treasurer also reported that he had recently sold $96,000 par value of 3% Government Notes * * * at a profit of approximately $1,700 and had bought $120,-000 of the new Three Year * * * U. S. Government Notes.

"The Treasurer reported he had recently purchased for the Company $25,000 of Home Owners' Loan bonds at slightly above par."

"The Treasurer of the Company has continued to invest most of the Company's surplus funds in U. S. Obligations although the rate of interest has fallen. However, he has recently purchased for the Company, $17,000 Par City of Chicago Corporate 5% bonds * * * and if agreeable to the Board, suggests additional investments in City of Chicago bonds of fairly short maturities. This should have present consideration because the cash balance of the Company amounts to $61,110.06."

The Secretary testified:

"Q. What proportion of your entire assets represented an accumulated profit and income that you haven't distributed by way of dividends?

"A. I would say about $250,000, or something like that. * * *

"Q. The securities purchased here are Government bonds, $329,286.88?

"A. Yes."

Likewise, the following resolution also appears on several occasions:

"Be It Resolved, that * * * are hereby authorized * * * To borrow money for and on behalf and in the name of this Corporation, and in its name to sign, execute and deliver the notes of this Corporation in such amounts and for such time and at such rates of interest and upon such terms as they may see fit, and to pledge to said bank the bills receivable, stocks, bonds or other property of this Corporation as security for any moneys so borrowed * * *."

Respecting the Louisiana land holding, the following facts appear in the minutes of the stockholders' meetings:

"The meeting then proceeded to a discussion of the continuation of the payment of taxes on the thirty odd thousand acres of lands owned in Louisiana. Mr. Weeks laid before the Board some maps showing the position of the Company's lands and recent oil developments indicating that one fairly good well had been brought in about seven miles west of the company's lands. After a considerable discussion, it was decided that the Company should continue to pay taxes, getting them down to the lowest

point possible, but not to spend any money in the study of oil well development until the oil business materially improved when the matter might again be brought to the attention of the Board."

The testimony discloses:

"* * * by looking at the records, the Lumber Company decided down there in Louisiana to set up the Land Company to sell their lands, * * * the cut-over lands, after the timber was off, and they organized this Garyville Land Company in 1917 and put certain agents in charge to sell these lands. * * * The Garyville Land Company has owned all the land they haven't sold. They sold quite a bit of it. * * * anything that the Garyville Land Company might do, the Directors of the Lyon Lumber Company approve or pass on. * * * They did not cut the last timber in Louisiana until about 1930 or 1931."

The activity of the directors and the stockholders respecting the Oregon land is to be found in the following minutes:

"About 1929, or just a year or two before they completed the cutting of that timber in Louisiana, they merged with the Continental Timber Land Company * * (It) had quite a debt * * *. The Lyon Lumber Company was through, except they did have quite a sum of money on hand. The Continental Timber Land Company had a large bond issue on their property and it was thought best, to save that, * * to merge. * * * they have paid off the bond issue of the Continental * * *. They thought they could sell it sooner than this. * * *

"Q. They expected to make a profit on it (by sale)?

"A. Well, by holding it, yes.

"Q. And selling it?

"A. And in the increase in value of the property over a number of years.

"We have been successful in actually closing sales for approximately 7,500,000 feet at a rate of $1.50 for Douglas fir * *.

"We are continuing our efforts to dispose of additional pieces. There is a new factor in that the D. * * * Co. has just opened a camp in its * * * holdings just south of a good part of the Company's timber * * *. What effect this will have on our timber sales for 1935 is not yet known. * * * We shall watch their operations to see if it is possible to expand our operations to that market. * * *

With one exception the sales made in 1934 averaged above that depletion rate, resulting in a profit on timber sales for the year of $745.05."

The minutes disclose the following disbursements to cover salaries of the officers and employees of the plaintiff:

"Chicago Office Expense $250.00 monthly subject to cancellation on 30 days' notice— this compensation to cover bookkeeping, office rent, stenographic service and all other expenses in connection with the running of the Chicago office.

"President's Salary $416.66 a month * * *.
    *    *    *    *    *    *

"A. In 1934 and 1935, no officers drew salaries. For the year ending June 30, 1933, there was; the president drew a salary and then the auditor received a small amount.

"A. * * * Baker, Fentress & Co. is a management corporation.

"Q. And how much were they paid for that service?

"A. I think they are paid now $250.00 a month."

Another disbursement was for a license in the State of Oregon. The testimony relative thereto is:

"Q. Here you have an item for an Oregon license. What is that, a license to cut timber?

"A. No, a license to do business in Oregon.

"Q. Oh, you do pay for a license to do business in Oregon?

"A. Well, qualified to hold property, I might say.

"Q. Does the land owner in Oregon have to pay a license tax?

"A. To own property, I understand they have to pay a license tax.

"Q. You mean a foreign corporation?

"A. A foreign corporation."

The conclusion that plaintiff was "doing business" in the face of these activities is inescapable. The facts show greater activity than was disclosed in the case of Von Baumbach v. Sargent Land Co., 242 U.S. 503, 37 S.Ct. 201, 204, 61 L. Ed. 460. There, the court said:

"It is evident, from what this court has said in dealing with the former cases, that the decision in each instance must depend upon the particular facts before the court.

The fair test to be derived from a consideration of all of them is between a corporation which has reduced its activities to the owning and holding of property and the distribution of its avails, and doing only the acts necessary to continue that status, and one which is still active and is maintaining its organization for the purpose of continued efforts in the pursuit of profit and gain, and such activities as are essential to those purposes.

"From the facts clearly established in these cases, we think these corporations were doing business, within the meaning of the act. They were organized for the purposes stated, and their activities included something more than the *mere holding of property* and the distribution of the receipts thereof. As was found by the district court, the evidence shows that these three companies *sold*, during each of the years named, *quantities of real estate*, and the same were not small. They sold stumpage from some of the properties which had been burned over, leased certain properties in the village of Hibbing, and granted leases to squatters. One of the companies made explorations and incurred expenses in the matter of test pits. They employed another company to see that the mining operations were properly carried on, and that the lessees lived up to the engagements of their contracts. 'All these things indicate,' said the learned district judge, 'the doing of and engaging in business. It (the corporation) was doing the business of handling a large property, selling lots, and seeing that the lessees lived up to their contracts. If that is not engaging in business, I do not know what is.' We agree that it certainly was doing business, and, as the Corporation Tax Act requires *no particular amount of business in order to bring a company* within its terms, we think these activities brought the corporations in question within that line of decisions in this court which have held such corporations were doing business in a corporate capacity within the meaning of the law."

To constitute doing business, less activity is required of a corporation which purchases its assets (land) "to hold for a rise" than in more actively purposed enterprises.

The judgment of the District Court is reversed and the cause remanded with directions to proceed in a manner consistent with the views herein expressed.