**CLALLAM LUMBER CO. v. UNITED STATES.**

**Civil Action No. 59.**

District Court, W. D. Michigan, S. D.

July 29, 1940.

Butterfield, Keeney & Amberg, of Grand Rapids, Mich., for plaintiff.

Joseph F. Deeb, U. S. Atty., of Grand Rapids, Mich., for defendant.

Findings of Fact.

RAYMOND, District Judge.

1. Clallam Lumber Company, the plaintiff herein, was incorporated under the laws of Michigan in June, 1910, with an authorized capital stock of $3,100,000; $2,006,131 of which was paid in by conveyances to the corporation of about 41,000 acres of timber lands situated in Clallam County, Washington, which for a number of years prior thereto had been owned by the respective incorporators as individuals, the stock of the corporation being issued to the individuals in proportion to their holdings.

2. The purposes of the corporation are thus stated in its articles of association: "To manufacture lumber, shingles, wood pulp, and all wood or forest products; to buy and sell lumber, timber, shingles, wood pulp, bark, and all wood or forest products; to own and sell such real estate as is convenient or necessary to the carrying on of the lumber and timber business. In connection with the lumber and timber business, to carry on a store for the sale of general merchandise and to own and operate tugs and steamers for towing logs. Such business to be carried on either in Michigan or elsewhere." None of said purposes has been carried into effect except the ownership of timber lands, and acts incident to said ownership, and there is no evidence of intention to carry out the corporate objects as stated in the articles, or to carry on any active enterprise.

3. The reason for incorporating the plaintiff corporation was to make it possible to sell the said timber lands to greater advantage, inasmuch as their marketability prior to the transfer thereof to the corporation had been affected adversely by the fact that the various individual holdings were interlaced with each other in such manner as to make the consummation of advantageous sales a matter of difficulty. The sole apparent purpose of the corporation was to hold the timber lands and effect a sale thereof as soon as a fair price could be obtained, the proceeds to be distributed to the stockholders. The acts of the corporation have been in pursuance solely of such purpose.

4. On August 18, 1936, plaintiff filed a capital stock tax return for the taxable year

ended June 30, 1936, in accordance with the requirements of the Revenue Act of 1935, Section 105 of the Revenue Act of 1935, c. 829, 49 Stat. 1014, 26 U.S.C.A. Int. Rev.Acts, page 796, imposing upon every domestic corporation with respect to carrying on or doing business for any part of the year ended June 30, 1936, an excise tax. The value of its entire capital stock was declared by the plaintiff as $750,000. Upon the face of the return exemption from taxation was claimed on the ground that the corporation was not doing business. Attached to the return was a detailed statement of the evidence upon which plaintiff relied to support its claim for exemption.

5. The Commissioner of Internal Revenue denied plaintiff's claim for exemption from capital stock taxation, holding that the plaintiff had been doing business within the meaning of the applicable internal revenue laws. Thereafter, and on March 16, 1937, plaintiff paid to the Collector of Internal Revenue for the District of Michigan capital stock taxes in the sum of $750, together with interest thereon in the sum of $25.58.

6. On July 31, 1937, plaintiff filed a capital stock tax return for the period ended June 30, 1937, in accordance with the law. The adjusted declared value of its entire capital stock was reported by plaintiff as $648,530.91. Exemption from taxation was claimed on the face of the return on the ground that the corporation was not doing business; and there was attached to the return a detailed statement of the evidence upon which plaintiff relied to support its claim for refund.

7. The Commissioner of Internal Revenue denied plaintiff's claim for exemption from capital stock taxation for the period ended June 30, 1937. Thereafter, on January 18, 1938, plaintiff paid to the Collector of Internal Revenue for the District of Michigan capital stock taxes in the sum of $648, together with interest thereon in the sum of $15.94.

8. On July 30, 1938, plaintiff filed claims for refund for the capital stock taxes and interest paid for the taxable periods ended June 30, 1936, and June 30, 1937, in the amounts of $775.58 and $663.94. Each claim was based on the ground that plaintiff was not doing business in the respective taxable periods and that the taxing statute is unconstitutional.

9. By registered letter dated and mailed on November 5, 1938, the Commissioner of Internal Revenue notified plaintiff of the disallowance of its claims for refund of 1936 and 1937 capital stock taxes and interest.

10. This action was timely commenced by plaintiff on October 12, 1939, for recovery of the capital stock taxes and interest paid for the taxable periods ended June 30, 1936, and June 30, 1937. The action is based upon the same grounds as set forth in the claims for refund.

11. The plaintiff corporation's activities have related merely to the ownership and conservation of its timberlands, with the view of liquidating its capital assets and distributing the proceeds among its stockholders as soon as a fair price therefor could be obtained.

12. The plaintiff corporation did not have the purpose to and did not engage in the business of speculating in timber lands in pursuit of profit and gain, and the organization was not maintained for the purpose of continued efforts in pursuit of such profit and gain.

13. The plaintiff corporation did not engage in the pursuit of gain through commercial activity and the use of capital assets, but merely held its lands for a profit to be derived solely from enhanced market value thereof.

14. During the year 1918, and prior to the period involved herein, a railroad, known as the Spruce Production Railroad, was built on behalf of the United States Government across a portion of plaintiff's lands for use by the Government during the war in securing spruce lumber for use in the manufacture of airplanes. The Government thereafter paid plaintiff for the right of way and for the timber it removed.

15. In January, 1921, and prior to the period involved herein, plaintiff sold to Larson Lumber Company 12,181 acres of timber land at an agreed price of $2,500,000. At or about the time of the execution of the contract, a hurricane destroyed much of the timber, and a suit was brought by the purchaser to rescind the contract. A cruise of the tract was made to ascertain the extent of the damage for the purpose of effecting, and which in fact did effect, a compromise settlement, and a supplemental contract was made on November 4, 1921, whereby the purchase price was abated to the extent of $500,000. The payment of the purchase price of $2,000,000 was agreed to be made in installments extending over a period of about ten years, and the agreed

payments were made each subsequent year, a portion of the proceeds being used to pay expenses incident to fire protection, the salary of the caretaker, and taxes, and the remainder has been distributed among the stockholders. The contract with Larson Lumber Company was fully performed prior to the period involved in this suit. Such sale of capital assets and distribution of the proceeds among the stockholders denies the conclusion that the organization was maintained for the purpose of continued efforts in the pursuit of profit and gain. There was no purchase of lands by plaintiff with the expectation that they could be resold at a profit, and with that purpose in view.

16. Following the making of the executory land contract with Larson Lumber Company in the year 1921, the officers of Clallam Lumber Company found that it was difficult, if not impossible, to dispose of the company's timber on land contract or for cash because of the large sums required to conduct logging operations and to build a railroad to get the logs to market, and also because prospective purchasers were unwilling to assume the large indebtedness which a land contract would entail. The company, therefore, entered into various cutting contracts whereby it made an executory sale of the timber upon its lands. The first of these was made in February, 1924. As a part of this contract, Clallam Lumber Company agreed to advance one-half of the money required for the construction of a logging railroad from its lands to a point near Clallam Bay. The only reason for the company's agreeing to advance these moneys was that this was necessary to enable it to sell its timber and the participation of plaintiff in the construction of the railroad was a part of its program of liquidation and was not doing business. This contract, in so far as it related to the logging of timber situated upon the company's lands, was fully performed prior to the period covered by this suit.

17. In the year 1927, Clallam Lumber Company made three more cutting contracts for the sale of all of its remaining timber. One of these contracts was made with Crescent Logging Company, which was then known as Irving Hartley Logging Company, and the other two contracts were made with Bloedel-Donovan Lumber Mills. Since the execution of these contracts, the only substantial activity of Clallam Lumber Company has been in connection with the supervision of logging operations to make certain that logging operations would produce the maximum amount of merchantable timber from its lands and the determination of the quantity of timber cut. The supervision of logging activities made it necessary for Clallam Lumber Company to employ field agents during the fiscal years ending June 30, 1936, and June 30, 1937. The determination of the quantity of timber cut also made it necessary from time to time to pay a part of the expense of scaling the logs or to pay a part of the expense of cruising the lands to determine the quantity of timber thereon and thus fix the price. During the years here in question, the quantity of timber cut from plaintiff's lands and sold to plaintiff's vendees under cutting contracts was determined, in part, from a joint cruise made in 1931 between plaintiff and Bloedel-Donovan Lumber Mills, and in part by scaling. In either event, in so far as plaintiff participated in such determination of quantity, its activity was but a necessary step in the liquidation of plaintiff's remaining properties and did not constitute doing business.

18. During the years 1936 and 1937, plaintiff entered into two supplemental agreements, one under date of March 6, 1936, with Bloedel-Donovan Lumber Mills, and one under date March 20, 1937, with Crescent Logging Company. The sole purpose and effect of these agreements was to modify existing cutting contracts by reducing the price to be paid for hemlock. The fact that plaintiff found it necessary, in order to make it possible for Bloedel-Donovan Lumber Mills and Crescent Logging Company to continue operations, to modify its existing contracts in this particular during the fiscal years here in question, did not amount to doing business. In the year 1936, plaintiff also made a supplemental agreement with Bloedel-Donovan Lumber Mills, modifying its cutting contracts to provide for determination of quantity of timber cut by scaling instead of by reference to the joint cruise, and covering other matters in addition. During the years here in question the plaintiff paid certain executive salaries in addition to direct expense for field supervision and scaling. It also received certain waiting rents under an oil and gas lease made in 1933 between plaintiff, as lessor, and Sun Oil Company, as lessee. These acts did not amount to doing business.

19. During the years ending June 30, 1936, and June 30, 1937, Clallam Lumber

Company owned certain United States Treasury Notes upon which it collected a small amount of interest. These notes were not purchased as an investment from which the company hoped to make a profit, but were acquired as the safest possible means of holding a fund of money which the company's directors deemed it necessary to retain against the contingency that the vendees under the cutting contracts might make default in their respective undertakings to pay taxes upon plaintiff's lands from which the timber had not as yet been cut and thus compel Clallam Lumber Company to pay the taxes in order to preserve its properties. Neither the retention of such moneys in the treasury of the company nor the purchase of treasury notes as a means of holding the fund and the collection of interest on such notes amounted to doing business.

## Conclusions of Law.

1. A corporation such as the plaintiff, which has reduced its activities to the owning and holding of property and distribution of its avails, and doing only the acts necessary to continue that status, is not carrying on or doing business, or engaged in business within the terms of Section 105 of the Federal ·Revenue Act of 1935, 26 U.S.C.A. Int.Rev.Acts, page 796, commonly known as the "Capital Stock Tax Law".

2. The liability of the plaintiff corporation for capital stock taxes must be decided by the purposes for which the corporate organization was maintained and where, as in the present case, there was never any intent to carry on any active enterprise, and the sole purpose of the corporation was to hold its timber lands and effect a sale thereof as soon as a fair price could be obtained, the proceeds to be distributed to stockholders, and there was no purpose or activity which constituted efforts or the use of the capital in the pursuit of gain and profit, the corporation was not carrying on or doing ·business or engaged in business within the terms of said "Capital Stock Tax Law".

3. At no time from the organization of the corporation until the conclusion of the period involved herein did the plaintiff corporation carry on or do business, or engage in business in such manner as to subject it to the capital stock tax.

4. At no time during the period from July 1, 1935, to June 30, 1937, did the plaintiff corporation carry on or do business or engage in business in such manner as to subject it to the said capital stock tax.

5. Said tax paid by the plaintiff, under protest, was illegally and improperly collected by the defendant, and plaintiff having taken all proper steps for the refund thereof is entitled to the repayment of said sum so paid under protest.

6. Judgment will be entered herein for the plaintiff in the sum of $775.58, with interest thereon at 6% per annum from March 26, 1937, and in the sum of $663.94, with interest at 6% per annum from January 18, 1938, to date of judgment.

## Opinion.

The issue presented is whether during the years ending June 30, 1936, and June 30, 1937, plaintiff corporation was doing business within the meaning of section 105 of the Revenue Act of 1935, as amended, which imposes a capital stock tax upon every domestic corporation with respect to carrying on and doing business. Substantially identical issues were presented to this court in cases involving the same corporation, with reference to the years ending June 30, 1923, and June 30, 1924. See Clallam Lumber Co. v. United States, D.C., 34 F.2d 944, and Clallam Lumber Co. v. United States, D.C., 34 F.2d 947. In these cases, it was held that there was then nothing in the activities of the Clallam Lumber Company to indicate "continued efforts in the pursuit of profit" [34 F.2d 946] or an intent to indulge in such efforts and that all activities of the company were calculated to bring about and were reasonably directed toward liquidation.

In the present case, the alleged important additional activities relied on by the United States involve modification of the terms of cutting contracts with Bloedel-Donovan Lumber Mills and Crescent Logging Company; the payment of salaries to certain of plaintiff's officers; collection of interest on United States Treasury notes; and the collection of rent under an oil and gas lease. Apart from these activities, the actions of plaintiff through its officers were substantially the same as those appearing in the former cases, and were limited to supervision of the manner in which the timber was logged from the lands of plaintiff and to a determination of the quantity of timber cut under the logging contracts. The substantial income during the period considered in the earlier cases was from the

sale of timber lands on an executory land contract, while in the instant case, the income was derived from cutting contracts. Because of increased supervisory activities, comparatively small executive salaries were paid during the period now under consideration. Investment activities of plaintiff consisted solely in the purchase of United States Securities as a means of retaining in the company treasury moneys which might be needed to protect the company's property by payment of taxes in event of default thereof by the vendees under the cutting contract. There is no evidence of repeated purchases and sales or that the purpose of the investment was to seek profit. The rent received by the company during the taxable periods was under a lease made prior thereto with the Sun Oil Company. It does not appear that the Clallam Lumber Company itself ever intended to engage in oil exploration activities.

It is the judgment of the court that these additional activities did not differ in any material respect from those which were before the court in the cases previously decided, and that plaintiff was doing only those things appropriate to accomplish ultimate liquidation.

The cases principally relied upon by the defendant to sustain its claim that these additional activities amounted to "doing business" within the meaning of the statute relied upon are: United States v. Peabody Co., 6 Cir., 104 F.2d 267; and Lyon Lumber Company v. Harrison, 7 Cir., 113 F.2d 443, decided June 14, 1940.

In the former case, it clearly appears that the corporation had built up a large reserve for profitable enterprise; that it bought and sold stocks for profit; and that bonds were sold for reinvestment at a later date. No comparable activities appear in the present case. In the Peabody case it was recognized that the test declared in Von Baumbach v. Sargent Land Co., 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460, still controls the determination of cases of this character.

In the Lyon Lumber Company case, supra, the court concluded that the corporation had no intention to liquidate and retire from business. After sale of extensive timber lands in Louisiana, two and a half million dollars of the proceeds were used in the purchase of another large timber tract in Oregon. Its clear purpose was to continue in lumber activities for profit and not liquidation.

Judgment will be entered in favor of plaintiff and against defendant in the sum of $775.58 with interest at 6% per annum from March 26, 1937, and in the sum of $663.94 with interest at 6% per annum from January 18, 1938, to date of judgment.